**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

<table>
<tr><td>STATE OF WASHINGTON,<br><br>    Respondent,<br><br>  v.<br><br>JONATHAN JOSHUA OSON,<br><br>    Appellant.</td><td>No. 83439-8-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION</td></tr>
</table>

MANN, J. — Jonathan Oson appeals his conviction for one count of first degree felony murder and unlawful possession of a firearm. Oson argues that: (1) the trial court erred in denying his motion to suppress the content of a cellular phone because the search warrant lacked probable cause and was overbroad; (2) defense counsel was ineffective by failing to request a Franks[1] evidentiary hearing, failing to challenge the search warrant, and failing to exercise due diligence in interviewing a witness; (3) the State failed to prove beyond a reasonable doubt that Oson committed felony murder and that Oson possessed a firearm in the state of Washington; and (4) the trial court

---

[1] Franks v. Delaware, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978).

violated his Sixth Amendment right to confrontation with the admission of hearsay statements made by a nontestifying codefendant. We affirm.

FACTS

A. Procedural History

Oson was charged by information with first degree murder with a firearm enhancement and second degree unlawful possession of a firearm.[2] After a bench trial, the trial court found Oson guilty as charged. The court sentenced Oson to a standard range sentence on both counts, including a 60-month firearm enhancement for the felony murder charge.

B. Substantive Facts

On June 8, 2018, Justin Schell traded drugs for a 12 gauge chrome-plated shotgun with a pistol grip and the serial number scratched off. Schell contacted Oson and asked if he could hold the shotgun for him until he could sell it. Schell was a felon and was prohibited from possessing firearms. Oson agreed. Schell and Oson met outside an Econo Lodge motel in Portland, Oregon, where Oson was living. Oson took the shotgun and pointed it at Schell and asked, "who can I rob?" Schell gave Oson the name and telephone number of a drug dealer that he often bought illegal drugs from, Ariel Romano. Oson and Schell then went into the motel room of an acquaintance, Raul Flores, so Oson could call Romano and set up a meeting to buy drugs. Flores was not present during the call and was allegedly unaware of Oson's plan to rob Romano. Oson arranged to meet Romano that night at a Fred Meyer in Vancouver, Washington.

---

[2] A third count for altering identifying marks on a firearm was dismissed with prejudice before trial.

Schell also planned to meet Romano later on June 8 at the Fred Meyer to buy heroin, before Oson got there.

At 5:58 p.m., Romano's phone received a call from the number 503-987-5166. That same evening, Oson sent that phone number to a friend on Facebook, claiming it was his own number, and asked, "is [Schell] meeting me still?" Four phone calls were made between Romano and 503-987-5166 that day. Romano also had a text exchange with 503-987-5166 shortly before he blocked the number from his phone at 11:23 p.m. Law enforcement could not determine the owner of the 503-987-5166 phone number.

At 6:05 p.m., Oson sent a Facebook message to a friend that said, "I need a mark." When asked if Oson meant "a lick," Oson responded, "yes." Washington State Patrol Detective Jennifer Ortiz testified at trial that a "lick" meant Oson was looking for someone to rob.

Schell arrived at the Fred Meyer parking lot at about midnight on June 8. Schell fell asleep for a time, then woke up and texted Romano. Romano told Schell that the Fred Meyer was closed; he asked Schell to meet him instead at a WinCo store on 119th Avenue. Schell called Oson and informed him that Romano would be at the WinCo in a Toyota Corolla.

Oson and Flores met Schell in the WinCo parking lot and tried to rob him. Romano left the WinCo in his Toyota with Oson and Flores in pursuit. At about 1:41 a.m., the car driven by Romano hit a tree in front of Prairie High School in Clark County, Washington. Romano was the only person in the car. An ambulance arrived and found Romano trapped in the car, unconscious, with a severe wound to his head. Romano died at the scene.

Schell drove to and around the WinCo parking lot, saw no one, parked in front, and waited about 20 minutes. Schell then left because Romano had not contacted him. After Schell left WinCo, he observed a crashed vehicle that looked like Romano's Toyota. But Schell did not stop because he was driving without a license. Schell parked at a McDonald's restaurant in the Orchards neighborhood of Clark County. At 2:06 a.m., Schell sent a text message to Romano expressing concern and then fell asleep in his car.

Washington State Patrol troopers arrived at the scene of the crash to investigate. They determined that Romano's vehicle did not engage in any measure to avoid crashing into the tree such as braking or steering. Evidence near the scene of the collision and from eye witnesses revealed that another vehicle was involved. Surveillance footage from multiple locations showed Flores's vehicle following Romano's vehicle at a high rate of speed moments before the murder. The footage also showed Schell's vehicle in the WinCo parking lot when Romano was murdered.

The medical examiner determined that around 1:41 a.m., Romano was killed by a shotgun wound to his head just before he crashed his vehicle. While the specific type of shotgun was undetermined, the wadding was consistent with 12 gauge shotgun ammunition. The medical examiner determined that Romano died from the shotgun wound to his head, not any injuries he may have suffered when his car hit the tree.

At 2:43 a.m., Oson sent a Facebook message to a friend asking, "how would you like to go on vacation for a little bit?" Unaware of what occurred the previous night, Schell met Oson at the Econo Lodge because he found a buyer for the shotgun. Oson

told Schell that Flores acted funny because "it was his first time." Schell did not learn of Romano's death until he read the newspaper on June 12.

According to Flores's girlfriend, Jessica Pyper, Flores told Pyper that once he and Oson arrived at WinCo "something happened" and Romano hit Flores with his car. According to Pyper, Flores said he had Oson drive his vehicle in pursuit of Romano. Flores told Pyper that he shot Romano and then observed Romano's vehicle go off the road. At trial, Pyper testified that Flores could not be the shooter because "under no circumstance would [Flores] ever let anyone else drive his car." Pyper believed Flores lied to her about being the shooter so that she would be less likely to talk to law enforcement.

On June 15, Oson sent a Facebook message to Wendy Boss Blessing stating, "I've got something special to get rid of, chrome-plated." Oson responded, "a 12g." Oson sent another Facebook message that said, "I got a chrome-plated 12 for sale." Pyper contacted detectives about Romano's murder and advised they speak with Oson. Oson was in jail at the time for violating community custody. Pyper informed detectives that Flores was the driver of the suspect sedan the night of Romano's murder and that Oson was the shooter. Pyper told the detectives that she and Flores share a phone and use Facebook and TextNow to communicate because the phone did not have cellular service. Pyper consented to a search of the phone and explained Flores had possession of the phone at the time of the murder. The detectives found no contact between Flores and Schell, or Flores and Romano.

On June 26, Oson told a friend over a phone call at the Clark County Jail that his belongings are at Lee Cavallaro's house, including a "duffle bag . . . and backpack . . .

full of goodies," and "chrome-plated . . . 12 gauge rims" that "someone's going to buy . . . for 450." A search warrant was issued for Cavallaro's residence in Vancouver, Washington. Officers found a duffle bag and backpack containing 12 gauge shotgun shells and mail addressed to Oson. A chrome-plated 12 gauge shotgun with a pistol grip was also found in the residence. Schell testified at trial that this was the same shotgun he gave to Oson. Oson's DNA and the DNA of three unknown individuals was found on the shotgun's trigger, trigger guard, and pump action. Flores's DNA was not found on the shotgun. Oson testified that on June 20 he momentarily handled a shotgun passed around at Cavallaro's. But an individual present at Cavallaro's residence during the search, Garrett Schultz, informed officers that Oson brought the shotgun to the residence.

On June 28, a search warrant was issued for two cell phones Oson had in his personal property at the Clark County Jail. Only the ZTE phone was searched because the LG Nexus could not be turned on. The phone contained a photograph of a shotgun lying on an office chair and text messages showing Oson used the phone on June 20. Detective Ortiz testified that she recognized the chair in the photograph as a chair in Cavallaro's residence. Law enforcement could not find a phone number associated with the ZTE phone. The court denied Oson's motion to suppress the contents of the ZTE phone.

On July 2, Schell met with Detective Ortiz and provided consent to search his phone. Detective Ortiz found messages Schell sent to Oson on June 16 that said, "and you fucking sold my chrome paintball gun?" Schell testified that he was referring to the shotgun he gave Oson. Schell gave Detective Ortiz two phone numbers that he used to

communicate with Oson: 360-723-2225 and 360-843-5496.  Oson admitted to using both phone numbers.  On July 27, Detective Ortiz obtained search warrants for both phones authorizing a search of the subscriber information, call detail records, and cell site location information between the dates of June 8 to 21.  The cell site location information for the 360-843-5496 number showed Oson in the area of the Econo Lodge from June 7 to 9, and connected to cell towers consistent with the route Flores's vehicle took in pursuit of Romano.  The records also revealed five phone calls between Oson and Schell between 12:00 a.m. and 1:30 a.m. on June 9.

Oson's cellmate, Nathan Coughlin, testified that Oson confessed to shooting Romano.  Coughlin tried to trade his information for a favorable sentencing recommendation.  Coughlin claimed Oson said he and Schell set up "this guy, Angel" at WinCo and "shot him through the window" after he tried to run away.  The court expressed credibility concerns about Coughlin, however all three witnesses, Coughlin, Schell, and Pyper, presented a consistent story about the attempted robbery.  Oson and Kin Bossy testified that they were both at a birthday party when Romano was murdered. But Bossy was incarcerated that night.

Oson appeals.

## ANALYSIS

### A. Motion to Suppress

Oson argues that the trial court erred in denying his motion to suppress the evidence that was seized through the July 28 search warrant because the warrant affidavit did not provide enough information to establish probable cause and the search warrant was unconstitutionally overbroad.  The State concedes that the warrant was

unconstitutionally overbroad, but argues that the admission of the related evidence was harmless. We agree with the State.

The Fourth Amendment provides that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. Constitutional provisions must "be sufficiently definite so that the officer executing the warrant can identify the property sought with reasonable certainty." State v. Stenson, 132 Wn.2d 668, 691-92, 940 P.2d 1239 (1997). Probable cause "requires a nexus between criminal activity and the item to be seized, and also a nexus between the item to be seized and the place to be searched." State v. Thein, 138 Wn.2d 133, 140, 977 P.2d 582 (1999). The particularity required in a search warrant depends "on the nature of the materials sought and the circumstances of each case." State v. Perrone, 119 Wn.2d 538, 547, 834 P.2d 611 (1992). A warrant is overbroad if it fails to describe with particularity items for which probable cause exists to search. State v. Maddox, 116 Wn. App. 796, 805, 67 P.3d 1135 (2003).

Article I, section 7 of the Washington Constitution "provides greater protection to individual privacy rights than the Fourth Amendment." State v. Betancourth, 190 Wn.2d 357, 366, 413 P.3d 566 (2018). It states, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law," and "[i]n contrast to the Fourth Amendment, article I, section 7 'recognizes an individual's right to privacy with no express limitations.'" Betancourth, 190 Wn.2d at 366 (quoting State v. Winterstein, 167 Wn.2d 620, 631, 220 P.3d 1226 (2009)). Washington courts have recognized that the search of "electronic storage devices gives rise to heightened particularity concerns."

State v. Keodara, 191 Wn. App. 305, 314, 364 P.3d 777 (2015).  Thus, a "mere possibility" of finding records of criminal activity does not establish the required nexus between criminal activity and the electronic storage devices to be searched.  Keodara, 191 Wn. App. at 316.

We review the issuance of a search warrant under an abuse of discretion standard.  State v. Maddox, 152 Wn.2d 499, 509, 98 P.3d 1199 (2004).  We review de novo, however, the trial court's probable cause and particularity determinations on a motion to suppress.  Keodara, 191 Wn. App. at 312 (citing State v. Higgs, 177 Wn. App. 414, 426, 311 P.3d 1266 (2013)).

Oson argues that the July 28 warrant for Oson's ZTE cell phone lacked the requisite particularity because it authorized a complete search of the cell phone.  The State concedes.

The July 28 search warrant for the ZTE cell phone authorized a complete search of the phone with no limitation to guide searching officers:

> YOU ARE THEREFORE COMMANDED, that with the necessary and proper assistance to make a diligent search, good cause having been shown therefore, of the following property within 10 days of this date:
>
> The LG Nexus and ZTE cellular phones belonging to Jonathan Oson, currently stored at the Clark County Jail property storage located at 707 West 13th street, Vancouver, Washington 98660.  The search to include a physical search of the phone and any electronic forensic imaging necessary to retain content.

In Washington, a search warrant must clearly state what it sought and must be limited in scope to the probable cause established in the supporting affidavit.  Keodara, 191 Wn. App. at 312.  The failure to limit the scope of the search warrant led to the seizure of a June 20 photograph of a shotgun lying on an office chair and text

messages showing Oson used the phone that same day. The State used the photograph to show that Oson unlawfully possessed a firearm in the state of Washington. Thus, the warrant was unconstitutionally broad.[3]

The State argues that the error of entering an overly broad search warrant was harmless given the overwhelming evidence linking Oson to the murder and possession of the shotgun in Washington State. Oson argues that the trial court's failure to suppress the contents of the ZTE cell phone was not harmless error because no rational trier of fact could have found Oson guilty of unlawful possession of a firearm had the evidence been suppressed. We agree with the State.

"Admission of evidence obtained in violation of either the federal or state constitution is an error of constitutional magnitude." State v. Contreras, 92 Wn. App. 307, 318, 966 P.2d 915 (1998). "[C]onstitutional error is presumed to be prejudicial and the State bears the burden of proving that the error was harmless." State v. Watt, 160 Wn.2d 626, 635, 160 P.3d 640 (2007) (citing State v. Guloy, 104 Wn.2d 412, 426, 705 P.2d 1182 (1985)). An error of constitutional magnitude can be harmless "if we are convinced beyond a reasonable doubt that any reasonable jury would have reached the same result without the error." Keodara, 191 Wn. App. at 317 (quoting State v. Jones, 168 Wn.2d 713, 724, 230 P.3d 576 (2010)). Under the "overwhelming untainted evidence test," a reviewing court looks to the untainted evidence to determine whether it "was so overwhelming that it necessarily leads to a finding of guilt." State v. Lui, 179 Wn.2d 457, 495, 315 P.3d 493 (2014) (citing Guloy, 104 Wn.2d at 426).

---

[3] Oson also argues that the warrant lacks probable cause. This opinion does not address the issue as the State conceded that the warrant was unconstitutionally broad, thus we decide on harmless error regardless.

Keodara is informative. In Keodara, the police obtained a search warrant to search a cell phone found in the car Keodara was driving. 191 Wn. App. at 309-10. The court recognized that the search of computers or other electronic storage devices gives rise to heightened particularity concerns. Keodara, 191 Wn. App. at 314. Thus, the warrant was overbroad because the search warrant allowing a search of his phone required more than the mere possibility of finding records of criminal activity. Keodara, 191 Wn. App. at 316. The court examined the evidence and determined, that while the text messages and photos found on the phone were relevant, the untainted evidence of Keodara's guilt was strong. Cellular phone tower records placed him near the location of the shooting, two eyewitnesses identified him, and another witness testified that Keodara contacted him and told him about the shooting. Thus, the court held that the trial court's failure to suppress the evidence was harmless error because the tainted evidence "was only one of many pieces of evidence that supported the State's case . . . [and] the untainted evidence of [the defendant's] guilt was strong." Keodara, 191 Wn. App. at 318.

Like Keodara, the photograph and text messages from Oson's ZTE phone were only part of the evidence the State used to prove Oson possessed the shotgun in Washington State. Here, the untainted evidence of Oson's guilt included: (1) corroborating testimony of Schell, Pyper, and Coughlin that implicated Oson in the murder and therefore possession of the shotgun; (2) Oson's Facebook message that he was looking for someone to rob; (3) Oson's Facebook message on June 15 stating, "I got a chrome-plated 12 for sale"; (4) the recorded call from jail with Oson stating his belongings are at Cavallaro's house, including chrome-plated 12 gauge rims that

someone was going to buy; (5) the duffle bag containing 12 gauge shotgun shells and mail addressed to Oson; (6) the chrome-plated 12 gauge shotgun found at Cavallaro's residence with Oson's DNA on it; (7) witness testimony that the shotgun was Oson's; (8) cellular records showing calls between Oson and Schell 11 minutes before the murder; (9) cellular tower records placing Oson's phone along the route Flores's vehicle took in pursuit of Romano; and (10) surveillance videos corroborating the events.

The combined evidence supports the conclusion, beyond a reasonable doubt, that a reasonable jury would reach the same conclusion regardless of the error. Thus, the trial court's decision to admit the evidence found on Oson's ZTE phone was harmless error.

B. Ineffective Assistance of Counsel

Oson argues that defense counsel was ineffective when he failed to request a Franks evidentiary hearing on the July 27 search warrant, failed to challenge the July 28 search warrant, and failed to conduct due diligence in interviewing and presenting testimony from Oson's alibi witness. We disagree.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantees a criminal defendant the right to effective assistance of counsel. U.S. CONST. amend. VI; State v. Grier, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). This court reviews ineffective assistance of counsel claims de novo. State v. Wooten, 178 Wn.2d 890, 895, 312 P.3d 41 (2013).

To prevail on an ineffective assistance of counsel claim, the defendant must show both that defense counsel's representation was deficient, and that the deficient representation was prejudicial. Grier, 171 Wn.2d at 32-33. Failure to establish either

-12-

prong is fatal to an ineffective assistance of counsel claim.  Strickland v. Washington, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

Trial counsel's performance is deficient if it falls below an objective standard of reasonableness, and there is "a strong presumption that counsel's performance was reasonable."  Grier, 171 Wn.2d at 33.  Counsel's performance is not deficient if it can be characterized as legitimate trial strategy.  Grier, 171 Wn.2d at 33.  To satisfy the prejudice prong, the defendant must establish within reasonable probability, that but for counsel's deficient performance, the outcome of the proceedings would have been different.  Grier, 171 Wn.2d at 34.

1. Failure to request a Franks hearing

Oson argues that defense counsel was ineffective for failing to request a Franks evidentiary hearing over the July 27 search warrant because the affidavit in support of the warrant included intentionally or recklessly misleading information.  We disagree.

A search warrant may be invalidated if the affidavit supporting the warrant contains material falsehoods included intentionally or with reckless disregard for the truth, of if there was deliberate or reckless omissions of material information.  State v. Garrison, 118 Wn.2d 870, 872, 827 P.2d 1388 (1992).  If the defendant makes a substantial preliminary showing of such material misrepresentation or omission, the defendant is entitled to a Franks evidentiary hearing.  Garrison, 118 Wn.2d at 872.  If the defendant cannot establish these requirements the inquiry ends.  Garrison, 118 Wn.2d at 873.  If the defendant establishes the allegations, the material misrepresentation must be stricken or the omitted material must be included.  State v. Cord, 103 Wn.2d 361, 367, 693 P.2d 81 (1985).  If at any point the affidavit fails to

support probable cause, the warrant is void and evidence obtained when the warrant was executed must be suppressed.  State v. Ollivier, 178 Wn.2d 813, 847, 312 P.3d 1, 20 (2013).

Oson argues that two paragraphs in the warrant affidavit were intentionally or recklessly misleading:

> On Thursday, June 28, 2018, a search warrant was obtained and served upon Oson's property at the Clark County Jail at 3:17 pm.  Your affiant obtained a ZTE cellular phone and a LG Nexus cellular phone pursuant to the search warrant.

> On Monday, July 2, 2018, your affiant interviewed Schell who stated he had two phone numbers via which he communicated with Oson.  Schell stated those numbers were: 360-723-2225 & 360-843-5496.

Oson argues that because the warrant does not specify that the two phone numbers were unrelated to the phones seized, the magistrate was misled into finding probable cause.

First, it is not clear that this is a false statement made "knowingly and intentionally, or with reckless disregard for the truth."  The warrant affidavit does not claim the numbers and physical phones are connected and the two statements are unlikely to be intentionally coupled as the warrant is organized in chronological order of the evidence discovered.  Second, the warrant affidavit contains sufficient evidence to establish probable cause with or without any connection to the cell phones.  The affidavit states the facts establish a high likelihood that "Schell was a middle-man, facilitating a meeting between Romano and Flores/Oson."  The information is enough to establish a reasonable inference that evidence of Romano's murder might be found in

-14-

the Metro PCS records associated with one of the numbers that Schell used to contact Oson without the jail property cell phones.

Oson cannot show that trial counsel's performance was deficient or prejudicial when he failed to request a Franks hearing because the record supports probable cause and thus the Franks hearing would have likely been unsuccessful. Trial counsel was not ineffective.

2. Constitutionality of the July 27 search warrant

Oson argues that trial counsel was ineffective for not challenging the constitutionality of the July 27 warrant for the cell company records associated with phone number 360-843-5496 because it lacks probable cause and fails the particularity requirement. We disagree.

For a search warrant to be valid it must be supported by probable cause. U.S. CONST. amend IV; WASH. CONST. art 1, § 7; State v. Fry, 168 Wn.2d 1, 5-6, 228 P.3d 1 (2010). "An affidavit establishes probable cause for a search warrant if it sets forth facts sufficient to allow a reasonable person to conclude there is a probability that [an individual] is involved in criminal activity and evidence of that activity will be found at the place to be searched." State v. Ross, 141 Wn.2d 304, 315, 4 P.3d 130 (2000) (citing State v. Young, 123 Wn.2d 173, 195, 867 P.2d 593 (1994)). "Probable cause requires a nexus between criminal activity and the item to be seized, and also a nexus between the item to be seized and the place to be searched." State v. Goble, 88 Wn. App. 503, 509, 945 P.2d 263 (1997). This court reviews challenges to the probable cause contained within warrant affidavit for abuse of discretion. State v. Vickers, 148 Wn.2d 91, 108, 59 P.3d 58 (2002).

Oson argues that the search warrant issued on July 27 lacks probable cause because it fails to tie Oson's 360-843-5496 phone number to his criminal activity. Oson relies on State v. Phillip, 9 Wn. App. 2d 464, 471, 452 P.3d 553 (2019) and State v. Denham, No. 78704-7-I, slip op. at 8-11 (Wash. Ct. App. Apr. 27, 2020) (unpublished opinion), https://www.courts.wa.gov/opinions/pdf/787047.pdf, rev'd, 197 Wn.2d 759, 489 P.3d 1138 (2021).

In Phillip, the court determined a sufficient nexus had not been established between the defendant's cell records and the victim's murder because the affidavits did not support a reasonable inference that the defendant was involved in the victim's death. 9 Wn. App. 2d at 471. The affidavit contained a crime scene description, information that a neighbor was asked to check on the victim, and information surrounding the victim's girlfriend's relationship with the defendant. Phillip, 9 Wn. App. 2d at 470.

In Denham, the court determined the affidavit lacked a nexus between the crime of burglary and the defendant's cell phone records. Denham, No. 78704-7-I, slip op. at 10. There, the court determined the language "'[o]btaining the records from [the defendant's] cellular phone service providers, I believe would assist in providing information on his location during the above listed crimes'" was speculative and indicative of an exploratory search. Denham, No. 78704-7-I, slip op. at 10-11 (first alteration in original).

This case is distinguishable. Here, the affidavit contained information that Romano died by homicide from a gunshot wound to the head, that Romano had been communicating with Schell right before his murder and moved the location of their meet

up to WinCo, that Flores's vehicle arrived at the WinCo right before the murder, that Flores's vehicle was likely chasing Romano's vehicle, that Pyper told officers Oson was the shooter, and that Schell confirmed he generally communicated with Oson using the 360-843-5496 number. These facts worked together to establish evidence that Schell acted as a "middle-man, facilitating a meeting between Romano and Flores/Oson." The affidavit contains more than mere speculative facts, and creates a probability that Oson was involved in Romano's murder and that evidence of that murder would be found in the cell records of the 360-843-5496 phone number. Oson's trial counsel was not insufficient in failing to raise a challenge to the warrant affidavit because it was unlikely to succeed and was a reasonable trial tactic.

Oson next argues that the search warrant fails to meet the particularity requirement when it authorized a blanket search of any information in the records including the CSLI[4] data. We disagree.

In State v. Griffith, 129 Wn. App. 482, 488-90, 120 P.3d 610 (2005), the court determined that the warrant was overbroad because it listed cameras, unprocessed film, computer processing units and electronic storage media, documents pertaining to internet accounts, and videotapes. The supporting affidavit stated Griffith used a digital camera to take pictures of the victims and he kept the pictures on a computer. There, the affidavit did not identify evidence that Griffith uploaded the pictures to the internet or that he used film or videotapes, thus the warrant was overbroad in permitting a search of items with no connection to the alleged offenses. Griffith, 129 Wn. App. at 488-90.

---

[4] Cell site location information.

Griffith is distinguishable. Here, the warrant is limited to records held by Metro PCS from June 8, 2018, to June 21, 2018. The warrant limits the information sought to the probable cause established by the warrant affidavit: that it was Oson's phone account, Oson had the phone on the night of the murder and that Oson was communicating with Schell that night. The warrant is limited in scope to the probable cause in the attached affidavit, thus it is sufficiently particular. Again, Oson's trial counsel was not insufficient because the warrant was sufficiently particular, thus counsel's inaction was reasonable and not prejudicial.

3. Witness testimony

Oson argues that trial counsel was ineffective by only interviewing his alibi witness, Bossy, the morning before Bossy's testimony and that left counsel unprepared for the State's rebuttal evidence showing that Bossy was incarcerated the night of the murder. We disagree.

A trial attorney's decision to call a witness for trial will generally not support a finding of deficient performance for the first prong of the Strickland test. Thomas, 109 Wn.2d 222, 230, 743 P.2d 816 (1987). The presumption that actions are reasonable can be overcome by a showing that there was a failure to conduct an appropriate factual investigation to prepare for a trial. State v. Jury, 19 Wn. App. 256, 265, 576 P.2d 1302 (1978). When a claim of ineffective assistance of counsel "rests on 'evidence or facts not in the existing trial record,' filing a personal restraint petition is the appropriate

step." In re Pers. Restraint of Hutchinson, 147 Wn.2d 197, 206-07, 53 P.3d 17 (2002) (quoting State v. McFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995)).[5]

In this case, trial counsel did not fail to interview a key witness, rather, counsel interviewed Bossy before testimony and chose to call him to testify. Again, a trial attorney's decision on whether to call a witness for trial will not support a finding of deficient performance. Thomas, 109 Wn.2d at 230. State v. Jones, 183 Wn.2d 327, 340, 352 P.3d 776 (2015), establishes deficient performance for failing to interview witnesses and not having a valid reason, not interviewing a witness and deciding to call him to testify. This was a tactical decision distinguishable from Jones, therefore, Oson fails at the deficiency prong of the Strickland test.

Even if Oson satisfies the deficiency prong, Oson still fails to show actual prejudice. Oson must establish that "but for counsel's deficient performance, the outcome of the proceedings would have been different." State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). In this case, the evidence of Oson's guilt including witness testimony, Facebook messages, text messages, cell tower location data, jail calls, surveillance videos, and corroborating physical evidence is overwhelming. Bossy testifying and not supporting Oson's alibi and potentially making him less credible are not factors that would have likely altered the outcome. Thus, Oson cannot establish that trial counsel's actions constitute prejudice.

---

[5] The State argues that the record establishes that trial counsel interviewed Bossy the morning of Bossy's testimony, but the record does not contain enough information to detail whether trial counsel knew of Bossy's arrest records. The record not clearly establishing what trial counsel knew or didn't know is not enough to preclude review.

C. Sufficiency of the Evidence

Oson argues that the State failed to prove beyond a reasonable doubt that he committed felony murder and that he possessed a firearm in Washington. We review a challenge to the sufficient of the evidence supporting a crime to determine whether "after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). A claim of insufficiency "admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." Salinas, 119 Wn.2d at 201.

1. Felony murder

Oson argues that there is insufficient evidence to establish that he was the shooter or that he and Flores were accomplices to the attempted robbery of Romano, thus, the State failed to prove beyond a reasonable doubt that Oson committed felony murder. We disagree.

To prove first degree murder, the State must establish beyond a reasonable doubt that Oson attempted to commit the crime of robbery in the first degree, and in the course of or in furtherance of such crime or immediate flight therefrom, Oson or an accomplice caused the death of Romano. RCW 9A.32.030(1)(c); RCW 9A.08.020(3).

Here, there is enough evidence for any rational trier of fact to conclude that Oson attempted to commit the crime of robbery and that Oson or an accomplice caused the death of Romano.[6] The pertinent evidence includes: possession of a 12 gauge shotgun

---

[6] Oson argues that Flores did not know that Oson intended to rob Romano. But Flores drove Oson to WinCo, chased after Romano, sustained injuries, and the whole endeavor was based on a robbery as established through Facebook messages and witness testimony.

consistent with the wadding for the projectile found to have killed Romano, Schell gave Oson Romano's name after Oson asked to rob someone, Oson's Facebook message asking for someone to rob, Schell's communication with Oson on the night of the murder telling Oson where Romano would be, Pyper's testimony, surveillance video showing Flores's car pursuing Romano, the cell tower evidence showing the location of Oson's phone in the same area as the car pursuit and death of Romano, Oson's Facebook message after the murder inquiring about vacation, Oson's possession of the shotgun at Cavallaro's home, Coughlin's testimony that Oson claimed to be the shooter, and Oson's DNA on the trigger. Thus, any rational trier of fact could have found that Oson was the shooter or Oson and Flores were accomplices in the attempted robbery of Romano.

### 2. Unlawful possession of a firearm in Washington

Oson argues that the State failed to prove that he unlawfully possessed a firearm in Washington State beyond a reasonable doubt.[7] We disagree.

To prove Oson unlawfully possessed a firearm, the State had to prove beyond a reasonable doubt that Oson owned, had in his possession, or had in his control any

---

[7] Oson also argues that his conviction must be reversed because of a clerical error in the trial court's written finding 49, stating, "Any of the acts in Findings of Fact 48 and 49 occurred in the State of Washington." Finding 49 intended to reference findings 47 and 48:

47. Between June 9, 2018 and June 21, 2018 the defendant knowingly had a firearm in his possession or control.
48. The defendant had previously been convicted of possession of a stolen motor vehicle and/or forgery, which are felonies.

The court's oral findings support the conclusion that finding 49 intended to reference findings 47 and 48:

I find also that between June 9th, 2018, and June 21st, 2018, the Defendant knowingly had a firearm in his possession or control and that he'd previously been convicted of a stolen motor vehicle and/or forgery, which are felonies. I find these acts also occurred in the State of Washington.

Oral findings should be used to interpret the trial court's written findings of fact and conclusions of law. State v. Hescock, 98 Wn. App. 600, 606, 989 P.2d 1251 (1999). Thus, we decline to reverse Oson's conviction for a clerical error.

firearm after having previously been convicted of a felony not qualifying as a serious offense. RCW 9.41.040(1)(b). "A person actually possesses something that is in his or her physical custody." State v. Davis, 182 Wn.2d 222, 227, 340 P.3d 820 (2014). "[P]ossession entails actual control, not a passing control which is only a momentary handling." State v. Callahan, 77 Wn.2d 27, 29, 459 P.2d 400, 402 (1969). "Actual possession may be proved by circumstantial evidence." State v. Manion, 173 Wn. App. 610, 634-38, 295 P.3d 270 (2013).

Oson argues that evidence only establishes that he momentarily handled the gun at Cavallaro's home in Washington, but was insufficient to prove actual possession. We disagree.

First, Oson argues that the record established no one else saw him possess the shotgun, however, Detective Ortiz established that a witness told officers that Oson brought the shotgun to the Cavallaro residence in Vancouver, Washington. Second, the totality of the evidence establishes that any rational trier of fact could reasonably conclude Oson possessed the shotgun in Washington State, including: the corroborating testimony of Schell, Pyper, and Coughlin that implicated Oson in the murder and possession; Oson's Facebook message looking for someone to rob; Oson's Facebook message on June 15 stating, "I got a chrome-plated 12 for sale"; Oson's jail call stating that all of his belongings are at Cavallaro's home including a bag containing 12 gauge shotgun shells; and the chrome-plated 12 gauge shotgun found at Cavallaro's residence with Oson's DNA on it. Because of the quantum of evidence before the court, viewing the evidence in the light most favorable to the prosecution, any rational trier of

fact could have found that Oson possessed a firearm in Washington State beyond a reasonable doubt.

### D. Right to Confrontation

In his statement of additional grounds, Oson argues that he was deprived of his Sixth Amendment right to confront witnesses when the trial court allowed Pyper to introduce hearsay statements made as a statement against interest by Flores, a nontestifying codefendant. We disagree.

In determining whether the hearsay statements violated the confrontation clause, the trial court used the "indicia of reliability" test outlined in State v. Anderson, 107 Wn.2d 745, 750, 733 P.2d 517 (1987). The trial court held that the statement possessed the required indicia of trustworthiness and was admissible.

The Washington Supreme Court adopted the "indicia of reliability" test following the United States Supreme Court's decision establishing the analysis. Ohio v. Roberts, 448 U.S. 56, 100 S. Ct. 2531 (1980) abrogated by Crawford v. Washington, 541 U.S. 36, 68, 124 S. Ct. 1354 (2004). Roberts conditioned the admissibility of all hearsay evidence on whether it falls under a "firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness." Roberts, 448 U.S. at 66. Roberts allows trial courts to weigh reliability factors in deciding whether hearsay evidence violates the confrontation clause, whether or not the statements are testimonial evidence.

In Crawford, the U.S. Supreme Court overruled Roberts and held that out of court statements by witnesses that are testimonial are barred, under the confrontation clause, unless witnesses are unavailable and defendants had prior opportunity to cross-examine witnesses, whether or not such statements are deemed reliable by the court.

But the Crawford test only applies to testimonial hearsay evidence. Crawford, 541 U.S. at 68. In analyzing nontestimonial hearsay evidence, the court explains, "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does Roberts, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." Crawford, 541 U.S. at 68. Thus, the vital inquiry is whether Flores's statements to Pyper were testimonial statements.

"Under the primary purpose test, courts objectively evaluate the circumstances in which the encounter occurs, as well as the parties' statements and actions." State v. Scanlan, 193 Wn.2d 753, 767, 445 P.3d 960 (2019). "In the end, the question is whether, in light of all of the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.'" Scanlan, 193 Wn.2d at 767 (quoting Michigan v. Bryant, 562 U.S. 344, 369, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011), and Ohio v. Clark, 576 U.S. 237, 245, 135 S. Ct. 2173, 192 L. Ed. 2d 306 (2015)).

A statement cannot fall within the confrontation clause unless its primary purpose was testimonial. "Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." Bryant, 562 U.S. at 359. Thus, if the statement is not testimonial, no confrontation clause concerns are raised and neither the "indicia of reliability test" in Anderson nor the Crawford test apply.

Flores's statements to his girlfriend, Pyper, did not have the primary purpose of substituting for trial testimony. Instead, the statements were a conversation between

two people about the crime.  There is no indication that either Flores or Pyper was involved with an investigation or expected that their conversation would be used as substitute trial testimony.  Flores's statement were not testimonial.  The statements should be analyzed under state and federal evidence rules, with flexibility on the State's development of hearsay law.  Thus, while the trial court's application of the "indicia of reliability" test under the guise of a confrontation clause analysis was improper, any error was harmless as the statements were properly admitted as an exception to hearsay.

When a declarant is unavailable as a witness, Rule of Evidence (ER) 804 exempts statements made against interest from the hearsay rules.  ER 804(b) provides, a hearsay "statement which . . . at the time of its making . . . so far tended to subject the declarant to . . . criminal liability" is one "that a reasonable person in the declarant's position would not have made . . . unless the person believed it to be true."  ER 804(b)(3); State v. Roberts, 142 Wn.2d 471, 494-95, 14 P.3d 713 (2001).  To invoke the exception, the declarant must be unavailable to testify, the statement must tend the declarant subject to criminal liability, and the statement must be trustworthy.  State v. Jordan, 106 Wn. App. 291, 300, 23 P.3d 1100 (2001).  To analyze the reliability of inculpatory hearsay statements, courts use reliability factors:

1. Was there an apparent motive for declarant to lie?
2. What was the declarant's general character?
3. Did more than one witness hear declarant's statement?
4. Was the statement made spontaneously?
5. Did the timing of the statements and the relationship between declarant and witness suggest trustworthiness?
6. Does the statement contain an express assertion of past facts?
7. Did the declarant have personal knowledge of the identity and role of the crime's other participants?

8. Was the declarant's statement based upon faulty recollection?
9. Was the statement made under circumstances that provide reason to believe the declarant misrepresented defendant's involvement in the crime?

Roberts, 142 Wn.2d 471, 497-98, 14 P.3d 713 (2000) (holding that there was no confrontation clause concern and applying these reliability factors to a statement against interest).  We review the trial court's decision on reliability of hearsay statements for abuse of discretion.  State v. McDonald, 138 Wn.2d 680, 693, 981 P.2d 443 (1999).

Here, the trial court dedicated five pages to applying all nine of the reliability factors and determined, based on the totality of the evidence and circumstances, that the statements had the required indicia of trustworthiness and were admissible.  The trial court did not abuse its discretion in applying and weighing the reliability factors and admitting hearsay evidence that constitutes a statement against interest.

Affirmed.

_____
Mann, J.

WE CONCUR:

_____          _____