# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
# DIVISION ONE

STATE OF WASHINGTON,

               Respondent,

    v.

JAMEL LEWIS ALEXANDER,

               Appellant.

No. 82703-1-I

ORDER DENYING MOTION FOR
RECONSIDERATION AND
WITHDRAWING AND
SUBSTITUTING OPINION

The respondent, State of Washington, has filed a motion for reconsideration of the opinion filed on January 30, 2023, and the appellant has filed a response. The court has determined that the motion should be denied, but the opinion should be withdrawn, and a substitute opinion filed; now, therefore, it is hereby

ORDERED that the motion for reconsideration is denied; and it is further

ORDERED that the opinion filed on January 30, 2023 is withdrawn; and it is further

ORDERED that a substitute unpublished opinion shall be filed.

Andrus, J.P.T.

Birk, J.

Smith, C.J.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 82703-1-I |
| Respondent, | |
| | DIVISION ONE |
| v. | |
| | UNPUBLISHED OPINION |
| JAMEL LEWIS ALEXANDER, | |
| Appellant | |

ANDRUS, J.P.T. — Jamel Alexander appeals his conviction for first degree murder, challenging several evidentiary rulings made at trial and the validity of the search warrant and subsequent search of his cell phone. We conclude the trial court erred in excluding evidence that another person admitted to committing the crime, an evidentiary error that was not harmless. We also conclude the trial court made other evidentiary errors that may recur on remand. We reject Alexander's arguments that the search warrant was overbroad or that the search was untimely, but conclude the police exceeded the scope of the warrant by looking at photographs outside the warrant's specified date range without first obtaining permission to conduct such a broad search. We reverse Alexander's conviction and remand for a new trial.

Citations and pin cites are based on the Westlaw online version of the cited material.

<u>FACTS</u>

On the evening of October 11, 2019, Alexander paid for consensual sex with S.B. near a parking lot of the Cedar Creek Apartments in Everett, Washington. Surveillance footage from the apartment complex captured S.B. and Alexander, wearing an Oakland Raiders hat, a Puma jacket, and Vans shoes, entering the apartment complex parking lot shortly after 9 p.m., walking together to the far end of that lot and disappearing behind a parked van. The same footage showed Alexander appearing, alone, from behind that van and walking slowly out of the parking lot at 9:34 p.m. Alexander can be seen in the video holding his cell phone to his ear. Additional surveillance video from a city bus captured Alexander board a bus, without his Oakland Raiders hat, and sit quietly looking down at the cell phone in his hand. Alexander exited the bus a few minutes later and stopped briefly at a gas station, where he was last recorded.

The next morning, a resident of the apartment complex found S.B.'s naked body on a dirt path behind the complex when he took his dog outside for a walk. Her clothes had been torn off and she had multiple injuries to her head and neck. The cause of S.B.'s death was identified as blunt force trauma to her head and neck. The medical examiner determined that some of her injuries were likely caused by the victim having been stomped with the sole of a shoe.

Police found Alexander's Oakland Raiders hat, splattered with S.B.'s blood, near her body. Forensic testing revealed the DNA from several individuals on S.B.'s body, including that of Alexander found inside S.B.'s bra and on the neckline of her dress.

- 2 -

Police saw a number of footprints around S.B.'s body and believed that the nearby blackberry bushes showed signs of a struggle. The police summoned a team of trackers, led by Bob Brady, who evaluated the crime scene. According to Brady, the footprints at the scene of the crime were consistent with Vans shoes and consistent with the shoe print on S.B.'s face and neck.

Police tracked the footprints and what appeared to be drops of blood from the body, down a trail, to one of the nearby apartment buildings, where investigators found similar footprints on the threshold of apartment F203. Brady concluded that these footprints appeared to travel away from the body to the apartment building and then back. A search of the apartment led to the discovery of evidence of drug dealing, but no evidence connecting the apartment to the murder.

On October 13, 2019, S.B.'s boyfriend, Vernon Butsch, called the police to report that he had run into Caterina Roy and her boyfriend Angel,[1] who lived in apartment F203 and sold drugs to S.B. Butsch told police that "they said sorry about your loss for beating her to death but we don't care—move on." Butsch said Roy described "how they carried her bruised bloody body [and] dropped her on the dirt to die for good." According to Alexander's trial attorney, when police interviewed Roy at the apartment complex, she admitted she had spoken with Butsch but denied any knowledge of S.B.'s death. Roy refused to testify at trial and the trial court excluded as hearsay any testimony about what Roy reportedly told Butsch.

---

[1] Angel is also known as Erasmo Ramirez Lopez.

On October 17, 2019, police questioned Alexander about his involvement in S.B.'s murder. Alexander admitted he had solicited sex from S.B. and left his Oakland Raiders hat behind, but he insisted S.B. was alive when he left her. Police confronted Alexander with photos from a convenience store Alexander had visited after leaving S.B. The images showed red stains on the bottom of one of Alexander's shoes which the police believed to be blood. Alexander claimed he had stepped in a Bang Energy drink causing the stain. The State produced evidence from Bang that none of its drinks contains red dye. Alexander also assured police officers that they would find the clothes he wore that evening—the Puma jacket, pants, and Vans shoes—in his home but police could not find these items.

A jury convicted Alexander of first-degree murder. Alexander appeals.

## ANALYSIS

### A. Evidentiary Errors and Right to Present a Defense

Alexander first argues the trial court erred in excluding evidence that (1) Roy implicated herself and her boyfriend in the crime; (2) S.B. wrote an entry in her diary dated 10 p.m. on the night of her murder—after Alexander had left her—suggesting she was still alive when he left her at 9:34 p.m.; and (3) the diary entry revealed that a drug dealer named Rocky was upset with S.B. for stealing drugs from him, creating a motive for killing her. He further argues that even if the evidence was inadmissible, excluding such probative evidence denied him the right to present a defense.

We conclude the trial court erred in excluding some, but not all, of this evidence and the erroneous evidentiary rulings were not harmless. We otherwise reject his constitutional argument.

The United States Constitution and the Washington State Constitution guarantee defendants the right to present a defense. U.S. Const., amend. VI, XIV; Wash. Const., art. I, § 3; *State v. Wittenbarger*, 124 Wn.2d 467, 474, 880 P.2d 517 (1994). To determine whether the exclusion of evidence violates a defendant's constitutional right to present a defense, we engage in a two-part analysis. *State v. Arndt*, 194 Wn.2d 784, 797-98, 453 P.3d 696 (2019); *State v. Clark*, 187 Wn.2d 641, 648-49, 389 P.3d 462 (2017). First, we review a trial court's evidentiary rulings for an abuse of discretion. *State v. Jennings*, 199 Wn.2d 53, 58, 502 P.3d 1255 (2022). A trial court abuses its discretion if no reasonable person would take the view adopted by the trial court. *Id.* at 59. Second, we determine whether such rulings violated a defendant's rights under the Sixth Amendment de novo. *Clark*, 187 Wn.2d at 648-49.

### 1. Roy's Incriminating Statements

Alexander first contends that the trial court erred in excluding Roy's self-incriminating statements to Butsch under ER 804(b)(3). We agree.

Hearsay, out-of-court statements offered to prove the truth of the matter asserted, is inadmissible unless an exception or exclusion applies. ER 802. We review a trial court's ruling on the applicability of a hearsay exception for an abuse of discretion. *State v. Rodriquez*, 187 Wn. App. 922, 939, 352 P.3d 200 (2015). A

trial court abuses its discretion if its decision is "manifestly unreasonable or based on untenable grounds or reasons." *Id.*

Under ER 804(b)(3), a statement against interest is admissible if it:

was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. In a criminal case, a statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Inculpatory statements against a declarant's penal interest are admissible if (1) the declarant is unavailable, (2) the declarant's statement tends to subject them to criminal liability to such an extent that a reasonable person would not have made it unless they believed it was true, and (3) the statement is corroborated by circumstances that clearly indicate its trustworthiness. *State v. J.K.T.*, 11 Wn. App. 2d 544, 566, 455 P.3d 173 (2019). Courts should look to the following criteria when evaluating the trustworthiness of such statements:

1. Was there an apparent motive for the declarant to lie?
2. What was the declarant's general character?
3. Did more than one witness hear declarant's statement?
4. Was the statement made spontaneously?
5. Did the timing of the statements and the relationship between declarant and witness suggest trustworthiness?
6. Does the statement contain an express assertion of past facts?
7. Did the declarant have personal knowledge of the identity and role of the crime's other participants?
8. Was the declarant's statement based upon faulty recollection?
9. Was the statement made under circumstances that provide reason to believe the declarant misrepresented defendant's involvement in the crime?

*State v. McDonald*, 138 Wn.2d 680, 694, 981 P.2d 443 (1999). The trial court's decision on the reliability of such statements is reviewed for abuse of discretion. *Id.* at 696. If the statement is offered by the defendant, "the presumption is admissibility and not exclusion." *State v. Roberts*, 142 Wn.2d 471, 497, 14 P.3d 713 (2000).

The trial court found, and the State concedes, that Roy refused to testify and was therefore unavailable. The court also implicitly found that Roy's statement was against her penal interest by noting that the statement "'Sorry for your loss, for beating her to death,' could[] be interpreted as an admission that the witness was involved in beating her to death." It further noted that the statement "We carried her bruised, bloody body and dropped her on the dirt to die for good" could have subjected Roy to some degree of legal responsibility for the improper disposal of a corpse, interference with an investigation, or being an accessory after-the-fact. The trial court did not abuse its discretion in concluding that Roy's statement tended to subject her to criminal liability to such an extent that a reasonable person would not have made it unless she believed it was true.

In analyzing the third prong of the test, the trustworthiness of Roy's statement, the trial court erroneously applied *State v. Ryan*, 103 Wn.2d 165, 691 P.2d 197 (1984), the test for evaluating the admissibility of child hearsay, rather than *McDonald*, the test for evaluating the trustworthiness of statements against penal interest. While the factors are similar, they are not identical. The nine Ryan factors are:

> (1) whether there is an apparent motive to lie; (2) the general character of the declarant; (3) whether more than one person heard

- 7 -

the statement; (4) the spontaneity of the statements; (5) the timing of the declaration and the relationship between the declarant and the witness; (6) whether the statement contained express assertions of past fact; (7) whether the declarant's lack of knowledge could be established through cross-examination; (8) the remoteness of the possibility of the declarant's recollection being faulty; and (9) whether the surrounding circumstances suggested the declarant misrepresented the defendant's involvement.

*State v. Kennealy*, 151 Wn. App. 861, 880, 214 P.3d 200 (2009) (footnote omitted) (citing *Ryan*, 103 Wn.2d at 175-76).

Applying the *Ryan* test, the trial court found that Roy had no apparent motive to lie, her statements to Butsch were spontaneous, and there was no reason to believe she misrepresented her involvement in S.B.'s murder, all of which favored admissibility. The court, however, also found that Roy was untrustworthy in general character, her statement was "cold," and she did "not [have] a warm, friendly relationship" with Butsch, which weighed against admissibility.

When the trial court looked at the seventh *Ryan* factor, it expressed a concern that the State lacked the ability to cross examine Roy due to her unavailability. The court stated that "it seems that cross-examination could show the declarant's either lack of knowledge or lack of sincerity in making the statement" and cross-examination "could show a lot of things that would tend to detract from the weight of the testimony." The court also thought it was highly problematic that the declarant might have had a faulty recollection because the details of her statement "may be contradicted by other evidence." The court felt that "cross-examination is the most powerful factor. I think possibility of faulty

retelling is a very important factor in this analysis and inescapable. And . . . on balance, the *Ryan* factors do not favor admissibility of this evidence."

The trial court abused its discretion in basing its decision to exclude Roy's statement under ER 804(b)(3) on her unavailability for cross examination. First, the ability of the State to cross examine a declarant is not a factor under *McDonald*. The seventh *Ryan* factor, whether the declarant's lack of knowledge could be established through cross-examination, is simply not a part of the *McDonald* test. Second, all the hearsay exceptions set out in ER 804, including statements against penal interest in ER 804(b)(3), require the declarant to be unavailable for cross examination. The inability to cross examine a declarant would thus never be a legitimate basis for excluding a statement against interest under ER 804(b)(3). The trial court's application of the wrong legal standard here was an abuse of discretion. *State v. Rafay*, 167 Wn.2d 644, 655, 222 P.3d 86 (2009) (court abuses discretion if decision was reached by applying the wrong legal standard or based on erroneous view of law).

This error was not harmless. To determine whether a trial court's abuse of discretion warrants reversal, we apply the nonconstitutional harmless error standard. *State v. Smith*, 106 Wn.2d 772, 780, 725 P.2d 951 (1986). "Where the error is not of constitutional magnitude, we apply the rule that 'error is not prejudicial unless, within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'" *Id.* (quoting *State v. Cunningham*, 93 Wn.2d 823, 831, 613 P.2d 1139 (1980)).

Here, there is a reasonable probability that the outcome of the trial could have been materially affected had Roy's statements to Butsch been admitted. If the jury believed Butsch's recounting of Roy's admissions, then the jury could have reasonably concluded that someone with no known connection to Alexander and who resided in the very apartment to which police tracked footprints from the scene of the crime murdered S.B. The evidence clearly tends to point out someone besides Alexander as the guilty party and excluding such other suspect evidence is not harmless error.[2] *See State v. Franklin*, 180 Wn.2d 371, 382-83, 325 P.3d 159 (2014) (trial court exclusion of probative other suspect evidence is not harmless error). We reverse Alexander's conviction on this basis.

### 2. S.B.'s October 11 Diary Entry

Although the exclusion of Roy's statements to Butsch warrants a reversal of Alexander's conviction, we will address his other evidentiary arguments as they are likely to arise on remand. *See Philadelphia II v. Gregoire*, 128 Wn.2d 707, 716, 911 P.2d 389 (1996) (in the interest of judicial economy, appellate court may address an issue likely to occur following remand if parties have briefed and argued issue in detail).

Alexander contends the trial court erred in excluding an October 11 entry from S.B.'s diary purportedly written on the night of her murder *after* Alexander had left. We conclude that the trial court did not err in excluding the entry as hearsay

---

[2] Because the trial court's erroneous evidentiary ruling was prejudicial, we reverse Alexander's conviction without addressing whether the ruling violated Alexander's right to present a defense. *See Jennings,* 199 Wn.2d at 59 (courts are not required to analyze both evidentiary issue and constitutional issue in every case and should reach constitutional question only if evidentiary rulings were not erroneous).

but did abuse its discretion in excluding it when offered for the nonhearsay purpose of demonstrating the importance of the police failure to copy and retain the apartment complex surveillance footage after 10 p.m. that night.

Police found S.B.'s purse near her body. Inside was a small spiral notebook with what appeared to be several diary entries, including one dated October 11, 2019, the night of her murder, with a handwritten note suggesting the entry was written at 10 p.m., after the surveillance video showed Alexander leaving the area. Butsch, S.B.'s boyfriend, confirmed that the notebook belonged to S.B. and that she used it as a diary. In a pretrial deposition, Butsch testified that S.B. wrote in her diary a lot and that he recognized the notebook as hers because she had bought it shortly before she died. He also testified that he recognized S.B.'s handwriting in the notebook.

Because the diary was new, S.B. had written only a few entries but each was dated in the same way–with the date, then the day, then the time.[3] The final entry in the diary was dated "Oct 11th 19 Friday 10pm." This entry read

> I went to Rocky's for the first time. He thinks it was me that took his shit but I can tell Casey doesn't think so and is trying to get my back[.] That shit is [f---ed]. Rocky saw me & Vernon fighting when he brought me back into the complex. God Vernon is such a piece of shit if he hadn't done that it would've been cool he's such an asshole [f---ing] faggot.

Alexander offered the October 11 diary entry for three different reasons. First, he argued the date and time of the entry was relevant to show that S.B. was still alive when Alexander left her at 9:34 p.m. Second, he maintained that the substance of the entry itself was admissible "other suspect" evidence because it

---

[3] For example, one entry is dated "Oct 10th, 19 Thursday 9 pm."

raised the possibility that S.B.'s drug dealer, Rocky, suspected S.B. stole drugs from him, giving him a motive for killing her. Third, Alexander contended the date and time evidence was admissible as impeachment evidence to demonstrate the inadequacy of the police investigation. The trial court excluded the diary entry as inadmissible hearsay.

While the trial court properly concluded the diary entry was inadmissible hearsay and other suspect evidence, the date and time of the entry was admissible for the nonhearsay, and limited purpose of impeaching the adequacy of the police investigation.

### a. Hearsay

Alexander contends the diary entry was admissible as a present sense impression under ER 803(a)(1), a description of S.B.'s state of mind under ER 803(a)(3), or past recollection recorded under ER 803(a)(5). We disagree with each argument.

First, the diary entry is not a present sense impression. Under this exception, "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter" is not excluded as hearsay. ER 803(a)(1). "Present sense impression statements must grow out of the event reported and in some way characterize that event." *State v. Martinez,* 105 Wn. App. 775, 783, 20 P.3d 1062 (2001), *overruled on other grounds by State v. Rangel-Reyes,* 119 Wn. App. 494, 81 P.3d 157 (2003). "The statement must be a 'spontaneous or instinctive utterance of thought,' evoked by the occurrence itself, unembellished by premeditation, reflection, or design. It is

not a statement of memory or belief." *Id.* (quoting *Beck v. Dye,* 200 Wash. 1, 9-10, 92 P.2d 1113 (1939)).

The diary entry is not a spontaneous utterance but a statement of memory and belief. If we assume S.B. wrote the entry at 10 p.m., as Alexander suggests, then it indicates S.B. visited Rocky on October 11 before she met up with Alexander at 9 p.m. The nature of the entry itself shows some degree of reflection about the events S.B. described. The trial court did not err in concluding the diary entry fails to meet the test of a present sense impression.

Alexander suggests that even if the body of the entry is hearsay, the date and time of the entry was admissible as a description of "an event or condition," namely the time of day, made as S.B. was perceiving it. But the present sense impression exception to the hearsay rule is interpreted narrowly to avoid admitting evidence where particularized factors guaranteeing trustworthiness are not present. *Idaho v. Wright*, 497 U.S. 805, 818, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990). Identifying the date and time of day is qualitatively different from, and lacks the trustworthiness of, statements made to a 911 dispatcher describing the details of an assault and robbery as it is happening, as in *State v. Robinson,* 189 Wn. App. 877, 889-90, 359 P.3d 874 (2015)*,* or statements a victim made to her daughter about needing to hide as they were being stalked by the defendant, as in *State v. Brush*, 183 Wn.2d 550, 560-61, 353 P.3d 213 (2015).

Alexander has identified no authority for the proposition that a statement of the date and time of day constitutes a spontaneous description of an event or a condition under ER 803(a)(1). *See State v. Young*, 89 Wn.2d 613, 625, 574 P.2d

1171 (1978) (if a party does not provide a citation to support an asserted proposition, courts may "'assume that counsel, after diligent search, has found [no supporting authority]'") (quoting *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962)).

Alexander next argues the diary entry was admissible under ER 803(a)(3) as a reflection of S.B.'s then existing state of mind. ER 803(a)(3) allows "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition" but does not include statements of memory or belief. Alexander contends the content of the diary entry shows S.B.'s state of mind regarding Rocky. We disagree.

The only statements in the diary entry expressing S.B.'s state of mind at the time she wrote her notes are her angry comments about Butsch, statements of no relevance to Alexander's defense. S.B.'s comment that Rocky accused her of stealing drugs from him and that someone defended her from his accusations are statements of memory or belief, not expressions of fear. The trial court correctly concluded that the diary entry was not admissible as a reflection of S.B.'s state of mind.

Third, Alexander asserts the diary entry was admissible as a past recollection recorded under ER 803(a)(5). ER 803(a)(5) allows admission of "[a] memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness'[s] memory and to reflect that knowledge correctly."

Admission is proper when the proponent of the evidence demonstrates that (1) the record concerns a matter about which the witness once had knowledge, (2) the witness has an insufficient recollection of the matter to provide truthful and accurate testimony, (3) the record was made by the witness when the matter was fresh in the witness's memory, and (4) the record accurately reflects the witness's prior knowledge. *State v. White,* 152 Wn. App. 173, 183, 215 P.3d 251 (2009).

As a preliminary matter, the State argues that this rule applies only to statements made by a testifying witness. Compared to other hearsay exceptions found in ER 803, which address statements made by a "declarant," ER 803(a)(5) talks about statements made by a "witness." Courts applying the federal counterpart of this rule[4] have concluded that evidence is inadmissible under the rule "unless a witness, who once had knowledge of what the record contains, testifies." *Parker v. Reda*, 327 F.3d 211, 215 (2d Cir. 2003); *see also Jacobson v. Deutsche Bank, A.G.*, 206 F. Supp. 2d 590, 597 (S.D.N.Y. 2002), *aff'd*, 59 Fed. Appx. 430 (2d Cir. 2003) (recorded recollection does not apply where witness asserts privilege and does not testify); *United States v. Porter*, 986 F.2d 1014, 1017 (6th Cir. 1993) (the reliability of a recorded recollection is derived from the fact that "the out-of-court declarant is actually on the witness stand and subject to evaluation by the finder of fact.").

---

[4] Federal Rule of Evidence 803(5) allows for admission of
> A record that:
> (A) is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately;
> (B) was made or adopted by the witness when the matter was fresh in the witness's memory; and
> (C) accurately reflects the witness's knowledge.

Alexander urges us not to follow this federal case law because the title of the rule indicates that ER 803 is titled "HEARSAY EXCEPTIONS; AVAILABILITY OF DECLARANT IMMATERIAL." This analysis is supported by *State v. Alvarado*, 89 Wn. App. 543, 949 P.2d 831 (1998), in which this court addressed "whether the foundation requirements for admission of recorded recollections necessarily include the declarant's trial testimony that the statements were true when made." *Id.* at 545. In that case, a witness gave a tape-recorded statement to police indicating that he had seen Alvarado commit murder. *Id.* at 547. At trial, the witness testified that he "'couldn't really say [whether the recorded statement] was true or not.'" *Id.*

On appeal, this court noted that while "the ideal foundation" would consist of a witness testifying that they remember correctly recording a past fact, "what is ideal in theory may be some distance from what is possible in practice." *Id.* at 550. Instead, courts should evaluate whether a recorded recollection has sufficient indicia of reliability under a "totality of circumstances" test because

> the rule applies regardless of the declarant's availability to testify, and thus apparently does not contemplate that the declarant will always testify, let alone affirmatively vouch for the record's accuracy.

*Id.*

We need not decide that question here because even if the rule applies where the declarant does not testify, the proponent of the evidence must still demonstrate that the document accurately reflects S.B.'s knowledge at the date and time when she made her entry in the diary. A court must examine factors such as (1) whether the witness disavows accuracy of the recorded statement; (2)

whether the witness averred accuracy at the time of making the statement; (3) whether the recording process was reliable; and (4) whether other indicia of reliability establish the trustworthiness of the statement. *Id.* at 551-52.

The first and second factors obviously do not apply because the person who recorded the entry is the decedent. And we have no evidence from which to determine if S.B.'s method of recording the date and time of her entries was reliable. As the trial court reasoned, to assume S.B. knew what time it was when she wrote her diary entry would require speculation as to whether she had a timepiece and whether she used it. Nor does Alexander point to any other indicia of reliability to support the entry's trustworthiness. The trial court did not abuse its discretion in excluding the evidence under ER 803(a)(5).

And Alexander does not have a Sixth Amendment right to have the diary entry considered for the truth of the matter asserted. In assessing a constitutional challenge to a trial court's evidentiary decision, we must first determine if the evidence is at least minimally relevant. *State v. Orn*, 197 Wn.2d 343, 353, 482 P.3d 913 (2021). "If the evidence is relevant, the reviewing court must weigh the defendant's right to produce relevant evidence against the State's interest in limiting the prejudicial effects of that evidence to determine if excluding the evidence violates the defendant's constitutional rights." *Jennings*, 199 Wn.2d at 63. A court may bar evidence relevant to a theory of defense only where the evidence would undermine the fairness of the trial. *State v. Darden,* 145 Wn.2d 612, 621, 41 P.3d 1189 (2002). The State must demonstrate that the evidence is "so prejudicial as to disrupt the fairness of the fact-finding process at trial." *State*

*v. Jones,* 168 Wn.2d 713, 720, 230 P.3d 576 (2010) (quoting *Darden*, 145 Wn.2d at 622).

There is no dispute that the excluded hearsay statements in S.B.'s diary were at least minimally relevant. Evidence is relevant if it has any tendency to make the existence of a fact more or less probable. ER 401. If believed, the diary entry tended to show that S.B. was alive at 10 p.m., after Alexander had already left her, indicating that he could not have killed her.

But the right to present a defense is not "a means for an end run around the Rules of Evidence." *State v. Ritchie*, __ Wn. App. 2d __, 520 P.3d 1105, 1113 (2022). The underlying concern of this right is "whether there is a unique or aberrant rule that results in the defendant having a lesser Sixth Amendment right than that possessed by citizens in other jurisdictions or persons charged with a different crime in the same jurisdiction." *Id*. When the rule being applied is a well-established, commonly used rule that has often been applied without detriment to defendant's right to a fair trial, we are less concerned. *Id.* at 1116.

Thus, Alexander's right to present a defense "is subject to 'established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.'" *State v. Lizarraga*, 191 Wn. App. 530, 553, 364 P.3d 810 (2015) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973)). A defendant does not have "an unfettered right to offer testimony that is . . . inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988).

In *Lizarraga*, this court held that the exclusion of a hearsay statement at trial did not violate the defendant's right to present a defense. 191 Wn. App. at 558. There, Lizarraga, on trial for murder, sought to introduce the statement of a witness claiming that someone else had committed the crime. *Id.* at 554-55. The witness was unavailable, as he had been deported, and the defendant readily conceded that the statement was inadmissible hearsay. *Id.* at 555. He nonetheless argued that he had a right to present the statement as part of his right to present a defense. *Id.* The State opposed this, arguing that the statement was unreliable because the witness "would not swear to his statements about the shooting 'unless he was promised something in return'" and because the statements he made were "'entirely inconsistent with all the facts.'" *Id.* The trial court excluded the evidence, highlighting its unreliability, and noted that the State would have no practical way to challenge the statement at trial.

On appeal, we affirmed the exclusion. *Id.* at 558. We emphasized that "the hearsay rule has 'long been recognized and respected by virtually every State' and 'is based on experience and grounded in the notion that untrustworthy evidence should not be presented to the triers of fact.'" *Id.* (quoting *Chambers*, 410 U.S. at 298). We further reasoned that "allowing inadmissible hearsay testimony 'places the [witness's] version of the facts before the jury without subjecting the [witness] to cross-examination,' depriving the State 'of the benefit of testing the credibility of the statements' and denying the jury 'an objective basis for weighing the probative value of the evidence.'" *Id.* (quoting *State v. Finch,* 137 Wn.2d 792, 825, 975 P.2d 967 (1999)).

- 19 -

Those principles apply here. This case involves evidence excluded by the same hearsay rules whose application was deemed constitutional in *Lizarraga*. Like *Lizarraga*, the statements sought here, if offered for the truth of the matter asserted, are hearsay. And, as in that case, Alexander cannot present evidence demonstrating that the hearsay statements are nonetheless reliable. S.B. was found on a path behind an apartment complex where there were no lights and nothing discovered at the scene indicated she had a way of ascertaining the time when she wrote in her diary. As the trial court noted, any conclusion that S.B. knew what time it was when she wrote the entry would require speculation and, therefore, we cannot conclude the statement of the time was reliable. Alexander's interest in presenting unreliable hearsay evidence does not outweigh the State's interest in excluding unreliable evidence. The trial court's ruling was "nothing more than a standard application" of our hearsay rules. *Ritchie*, 520 P.3d at 1117. This evidentiary ruling did not violate Alexander's rights under the Sixth Amendment or article I, section 22. Alexander has no constitutional right to have S.B.'s diary considered for the truth of the matter asserted.

   b. Other Suspect Evidence

Alexander next contends the diary entry was admissible to establish that Rocky, who apparently occasionally sold drugs to S.B., had a motive to kill her after she allegedly stole drugs from him. According to Butsch, S.B. told him she had stolen drugs from Rocky about a week before she died. Butsch told police that he initially thought S.B. was lying but that if she were not, he knew Rocky "would be pretty pissed about that." He also told police that "apparently [Rocky]

doesn't [f---] around like that." Alexander sought to introduce the October 11 diary entry as evidence that Rocky, and not Alexander, committed the crime.

A trial court's exclusion of "other suspect" evidence is an application of the general evidentiary rule that excludes evidence if its probative value is outweighed by unfair prejudice, confusion of the issues, or potential to mislead the jury. *Franklin*, 180 Wn.2d at 371 (quoting *Holmes v. South Carolina*, 547 U.S. 319, 326-27, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006)). Before the trial court will admit "other suspect" evidence, the defendant must present a combination of facts or circumstances that points to a nonspeculative link between the other suspect and the crime. *Id.* at 381. The standard for the relevance of such evidence is whether it tends to connect someone other than the defendant with the charged crime. *Id.* Motive and opportunity to commit a crime are typically too speculative to make the other suspect evidence sufficiently relevant. *Id.* at 379.

Here, even if the diary established a motive for Rocky to harm S.B., "'[m]ere evidence of motive in another party, or motive coupled with threats of such other person, is inadmissible, unless coupled with other evidence tending to connect such other person with the actual commission of the crime charged.'" *Franklin*, 180 Wn.2d at 380 (alteration in original) (quoting *State v. Kwan*, 174 Wash. 528, 533, 25 P.2d 104 (1933)); *State v. Wade*, 186 Wn. App. 749, 764, 346 P.3d 838 (2015). There is no evidence in the record connecting Rocky to S.B.'s murder. Rocky is not affiliated with the apartment in which Roy and Angel resided. And there is nothing in the record to suggest a connection between Rocky and the crime scene or between Rocky and Roy or Angel. Because Alexander failed to

establish the necessary connection between Rocky and the murder, the diary entry was inadmissible as other suspect evidence.

Because evidence suggesting Rocky had a motive to harm S.B. is speculative and not relevant, *State v. Dixon*, 159 Wn.2d 65, 79, 147 P.3d 991 (2006), the trial court did not infringe Alexander's right to present a defense by excluding this evidence. Defendants have no constitutional right to present irrelevant evidence. *Jones*, 168 Wn.2d at 720.

### c. Nonhearsay Impeachment Evidence

Finally, Alexander contends the trial court erred in not admitting the diary entry for the nonhearsay purpose of impeaching the police investigation. We agree.

When a statement is not offered for the truth of the matter asserted but to show why police conducted the investigation in a particular manner, the statement is not hearsay and is admissible. *State v. Iverson*, 126 Wn. App. 329, 337, 108 P.3d 799 (2005). Alexander argued below that the October 11 diary entry was admissible for the nonhearsay purpose of impeaching the police investigation. On appeal, Alexander contends the diary entry was admissible to identify flaws in the police investigation, including the failure to retain video from the apartment complex after 10 p.m. to look for other possible assailants.

At trial, Detective Brad Walvatne testified that he was asked by the lead detective to find and review any video surveillance footage from the apartment complex. He determined that the complex had four operating cameras mounted on Building H and the office retained video for eight days. Detective Walvatne

watched 15 and a half hours of video starting at 6:00 p.m. on Friday, October 11 through 9:30 a.m. on Saturday, October 12. At approximately 9:03 p.m., he saw Alexander and S.B. enter the entrance to Cedar Creek. He followed the path they took through the parking lot and behind a van parked at the complex. The two disappeared behind the van which was in close proximity to the trail where S.B.'s body was later found. At 9:34 p.m., he saw Alexander appear on the video and leave the complex. He was on foot walking northbound toward Highway 99. He did not see S.B. on the surveillance video at any point through the remaining portion of the video.

Detective Walvatne also testified that while he watched the video, he saw a light come on at times by Building F and G. He later determined that there was a motion detection light on a maintenance shed near the trail where S.B.'s body was found. Then, at approximately 1:20 a.m. on the morning of October 12, three men appeared in the surveillance footage in the area of the maintenance shed. Detective Walvatne saw the men appear around the corner of Building G and walk northbound. One had some sort of a flashlight or headlight. He could not make out their faces and the office manager of the apartment complex stated she did not know who the men were. Detective Walvatne could not recall what type of clothing or shoes the men wore and he did not document his observation.

The police did not have a copy of this portion of the surveillance video. Detective Walvatne testified that although he tasked another detective with preserving the entire 15 and a half hours of video, he initially copied only two hours of the footage, from 8 p.m. to 10 p.m. By the time the detective returned to obtain

the rest of the video, the eight-day retention period had passed and the video was lost. The jury was thus unable to see any surveillance footage from the apartment complex after 10 p.m. on the night of October 11.

Alexander relies on *Alvarez v. Ercole*, 763 F.3d 223 (2d Cir. 2014) to argue that the diary entry, at least the date and time portion of the entry, should have been admitted for the limited nonhearsay purpose of impeaching the police's investigation and their failure to follow up on evidence of other suspects. In *Alvarez*, the defendant sought to elicit testimony about a police report that identified someone other than Alvarez as a potential suspect to show that the police investigation was flawed and had improperly disregarded an alternate suspect. The police report indicated that a witness, Vasquez, claimed to have information about the murder. Vasquez reported that his friend, Julio, told him that, on the night of the murder, he had "t[aken] care of" someone with whom he had quarreled. *Id.* at 227. The trial court precluded Alvarez from questioning the police about their failure to investigate this lead on hearsay grounds. *Id.* at 228.

On appeal, the Second Circuit concluded the trial court abused its discretion in excluding the evidence as hearsay because Alvarez had offered the evidence for the nonhearsay purpose of showing the inadequacy of the police investigation and their improper disregard of a promising alternative suspect. *Id.*

*Alvarez* is persuasive in its reasoning. While the diary entry was not admissible for the truth of its contents, it was admissible to demonstrate the police failed to preserve evidence that may have exculpated Alexander. Alexander elicited evidence that the police failed to preserve security footage after 10 p.m.,

after Alexander had left the apartment complex parking lot but before Detective Walvatne observed three men—none of whom were Alexander—walking in the general area where S.B.'s body was later found the next morning. Because the medical examiner did not estimate a time of death, it was possible S.B. was alive when Alexander left her at 9:34 p.m. and was not killed until much later that night or the next morning. The importance of this surveillance footage takes on a different light when we learn that the police had in their possession S.B.'s diary with some suggestion she may have been writing notes in it after Alexander left.

The facts of this case are also distinguishable from *State v. Rocha*, 21 Wn. App. 2d 26, 504 P.3d 233 (2022). In that case, Rocha appealed an arson conviction after he lit a car on fire on his father's property. A 911 dispatcher informed two police officers that the father had reported arguing with his adult son, the defendant. *Id.* at 28. The father also reported that the defendant had gone to a nearby gas station and filled two paper cups with gas and the father was unsure what the son would do with the gas. *Id.* The officers drove to the gas station but could not find father or son. One officer drove toward the father's home and, on his way there, saw the defendant walking on the road carrying a grocery bag inside in which he found two large drink cups filled with gasoline. *Id.* The officers did not detain the defendant and they saw him walk away toward his father's house. *Id.* at 29.

At trial, Rocha moved to exclude all statements the officers had received form the 911 dispatcher, specifically the report that father and son were in a "domestic dispute." *Id.* The State conceded the statement was not relevant to any

allegation but argued it was admissible for the nonhearsay purpose of explaining why the officers went to the gas station. *Id.* at 29-30. Rocha, on the other hand, argued that the statement that father and son had a domestic dispute was relevant to the charged offense because it supported the State's allegation that Rocha committed arson for a malicious purpose, an element of the charged crime. *Id.* at 30.

The trial court admitted the evidence and an officer testified at trial that he received a call for service that was described by the dispatcher as "a verbal disturbance between the father and son at a gas station." *Id.* Rocha denied being at a gas station with his father or having a dispute with him. *Id.* at 30-31. He testified he accidentally started the fire while working on a car on his father's property. *Id.* at 30. In closing, the State argued that Rocha admitted getting into an argument with his father, an admission he had not in fact made at trial. *Id.* at 31.

On appeal, Division Three of this court reversed Rocha's conviction, holding that the trial court erred in admitting the hearsay statement from the 911 dispatcher, concluding it was not relevant for the nonhearsay purpose for which it was admitted. *Id.* at 32. It held that the reason the police officers went to the gas station had no relevance except to prove that father and son had argued—to prove Rocha had a motive to set a car on fire on his father's property. *Id.* The court noted that

> [t]rial courts too often admit hearsay evidence for a nonhearsay purpose even when that purpose is irrelevant. We urge trial courts to objectively consider why the hearsay evidence is truly being offered. Hearsay statements truly being offered for nonhearsay

purposes retain their purpose even if untrue. If the proponent of the hearsay statement was to acknowledge the statement to be false and if this acknowledgement would favor the statement's opponent, then the hearsay statement is probably being offered for its truth and should be excluded.

21 Wn. App. 2d at 33.

Unlike in *Rocha*, the evidence here—the date and time information contained in the diary—was relevant to Alexander's defense that police failed to investigate other suspects, whether the date and time information was true or false. In this case, police failed to collect surveillance footage from a time when the victim may have been alive and they failed to question other suspects despite receiving a report that the other suspects may have admitted to hurting the victim. The gravity of these actions cannot be fully understood without evidence demonstrating that the police had *reason to believe someone else did it*. While evidence that S.B. may have written in her diary at 10 p.m. that night would be relevant for the hearsay purpose of proving she was still alive when Alexander left, it also has a valid, nonhearsay purpose, whether or not she actually wrote the diary entry at that time. This evidence gave police a reason to believe that S.B. *may* have been alive and a reason to collect video footage of the entire night. The failure to preserve this evidence is of particular importance given the State's rebuttal closing argument that "the video . . . eliminates any argument that any other suspect other than Jamel Alexander was present and murdered [S.B.] . . . ."

We conclude the date and time entry in S.B.'s diary should have been admitted for the nonhearsay purpose of impeaching the adequacy of the police investigation into possible suspects.[5]

B. Search Warrants

Alexander next challenges the validity of an October 22, 2019 search warrant of his cell phone, claiming it was unconstitutionally overbroad. He also contends the police exceeded the scope of the warrant when they looked at photographs on the phone that fell outside the date range specified in the search warrant. Finally, he argues the police did not complete the search of his phone in a timely manner. We reject his overbreadth and timeliness arguments but conclude the police did exceed the scope of the warrant by looking at photographs outside the date range in the warrant without explaining to the issuing magistrate the need for doing so.

Our constitutions protect individual privacy against state intrusion. U.S. CONSTITUTION amendment IV; WASHINGTON CONSTITUTION article I, section 7. Article I, section 7 of the Washington Constitution provides that "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." Article 1, section 7 "provides greater protection to individual privacy rights than the Fourth Amendment." *State v. Betancourth*, 190 Wn.2d 357, 366, 413 P.3d 566 (2018). "Whereas the Fourth Amendment prohibits 'unreasonable searches and

---

[5] Under ER 105, when evidence is admissible for one purpose but not admissible for another purpose, the court shall, upon request, restrict the evidence to its proper scope and instruct the jury accordingly. Because there is no hearsay exception allowing the diary to be admitted for the truth of the matters asserted in the entries, the State would be entitled to a limiting instruction at trial.

seizures,' article 1, section 7 of our State constitution prohibits any invasion of an individual's right to privacy without 'authority of law.'" *Id.*

State agents must have either the authority of a warrant or a well-established exception to the warrant requirement to lawfully intrude into an individual's private affairs. *State v. Denham*, 197 Wn.2d 759, 766, 489 P.3d 1138 (2021). In order for a warrant to be constitutionally valid it must be supported by probable cause and must tie the facts known to the State to the specific evidence it seeks to obtain. *State v. Phillip*, 9 Wn. App. 2d 464, 480, 452 P.3d 553 (2019).

During the investigation of S.B.'s death, police reviewed security footage of the parking lot adjacent to the crime scene and footage from Community Transit buses traveling northbound on Highway 99 between 8:22 p.m. and 9:40 p.m. This footage showed Alexander using his cell phone as he walked out of the apartment complex parking lot and while riding a bus he boarded thereafter. The police obtained a search warrant for his phone for evidence of S.B.'s murder. The warrant permitted the police to seize, as evidence of the crime, contact information, usage information, photographs of Alexander and associated metadata and physical location data, global position data, voice call data or texts, social media information, and Internet search information related to S.B.'s murder or the police investigation. The warrant limited the data to be seized to that which fell between 1:00 a.m. on October 11, 2019 and 4:00 p.m. on October 17, 2019.

At a CrR 3.6 hearing, Detective Tyler Quick testified that after Alexander's Samsung Galaxy Note 8 cell phone was seized, he was asked to conduct a forensic examination of it pursuant to the search warrant. He described the three

separate extractions done on this phone. First, he performed an "advanced logical extraction" using the tool he had available to him in the department. Second, he sent the phone to the United States Secret Service to perform both a physical extraction and a file system extraction. The advanced logical extraction generated a subset of some of the information present on the phone. The logical extraction pulls off information that a user can see as they scroll on their phone. It will find text messages, call logs, emails, photos, and videos that a user would expect to see.

But when Detective Quick compared the extracted data to the records provided by Alexander's cell service provider, T-Mobile, he could see there were discrepancies between the two. There were phone calls and text messages from October 11 in the T-Mobile phone records that Detective Quick could not find in his extracted data. He reported this discrepancy to Detective Fontenot and asked him to obtain judicial permission to do a physical extraction of the phone to find potentially deleted data.

In searching for relevant photographs of Alexander, Detective Quick used a tool called Cellebrite Physical Analyzer to review the photos he extracted. This software tool allowed Detective Quick to view the photographs one at a time or in a gallery view or to filter the photographs by date fields. The date field filter, however, was not seen by Detective Quick as reliable. He testified, for example, that often photographs in a phone lack any date associated with them because of the way a particular application or the phone's operating system works. At other times, he said, the date in the operating system does not reflect the date the photo

was taken (the "capture" date) but instead reflects the date it first appeared on the device (the "creation" date). The software only allowed Detective Quick to filter by one date at a time. He stated that he was reluctant to filter photographs by date because it could lead him to miss evidence he could otherwise seize under the warrant.

In the course of examining the phone's photographs in gallery view, Detective Quick came across photos of Alexander wearing an Oakland Raiders hat. Detective Quick testified that he was able to determine (although unclear how) that the photos fell outside the warrant's date range. He stopped his search of the phone and informed Detective Fontenot what he had found. Detective Quick did not duplicate the photos. Detective Fontenot used the information from Detective Quick to request an addendum to the search warrant to allow police to recover deleted data and to seize any photo of Alexander wearing the Oakland Raiders hat, regardless of the photo's date.

The November 12, 2019 search warrant addendum authorized the police to search Alexander's Galaxy Note 8 phone within ten days of the date of the warrant and permitted the seizure of any "[p]hotographs and video which depict Jamel Alexander and knit hats. Metadata associated with photographs and video which depict Jamel Alexander and knit hats." The court eliminated any date restriction on responsive photos or videos. It further allowed the seizure of any "[d]eleted or encrypted data associated with text messages, contacts and calls to and from the device" within the October 11 to October 17, 2019 date range.

Because Detective Quick lacked the tools to perform a physical extraction to find deleted data,[6] he sent the phone to a United States Secret Service agent in Colorado, who was also unsuccessful in performing the physical extraction. The Secret Service agent in turn sent the phone to Cellebrite Advanced Services in New Jersey to perform this service. Cellebrite performed both a physical and file system extraction in January 2020 and returned the phone and an encrypted flash drive containing the physical extraction report to Detective Quick on January 10, 2020.

Detective Quick then loaded the extracted data into his analyzer and clicked through and viewed all the evidence on the phone. He reviewed and physically read the content of all the files, looking for dates which would put the data within the date range specified by the warrant. He looked at approximately 49,000 images, some of which fell outside the date range of the original warrant. Some of the images that fell outside the parameters of the November 12, 2019 warrant addendum formed the basis for a third warrant addendum on February 11, 2020, authorizing the search of Alexander's Google account information. After Detective Quick identified and seized content covered by the warrant and warrant addenda, he created a 1,174-page report summarizing the results.

Alexander moved to suppress evidence obtained during the search of his cell phone, arguing that the initial October 22, 2019 warrant was overbroad and that the search pursuant to the initial warrant exceeded the scope of the warrant.

---

[6] A physical extraction creates a complete copy of the entire memory of the phone, including any deleted data.

The trial court issued findings of fact and conclusions of law rejecting Alexander's arguments.[7]

Alexander renews his challenge to the validity of the search of his cell phone data, arguing that (1) the October 22, 2019 search warrant was overbroad; (2) the police exceeded the scope of that warrant in their search by looking at photographs that fell outside the date range specified in the warrant; and (3) that the January 2020 physical extraction search was untimely because it occurred after the 10-day period authorized in the November 12, 2019 warrant.

1. Overbreadth

Alexander first argues the October 22, 2019 search warrant authorizing the search of his cell phone was unconstitutionally overbroad because it contained only a date range limitation and no subject matter limitations. We reject this argument.

Both the Fourth Amendment and article I, section 7 require that a search warrant describe with particularity the place to be searched and the persons or things to be seized. *State v. Perrone*, 119 Wn.2d 538, 545, 834 P.2d 611 (1992). A warrant is overbroad if it fails to describe with particularity items for which probable cause exists to search. *State v. Maddox,* 116 Wn. App. 796, 805, 67 P.3d 1135 (2003). A search warrant's description of the place to be searched and property to be seized is sufficiently particular if "it is as specific as the circumstances and the nature of the activity under investigation permit." *Perrone*, 119 Wn.2d at 547. A generic or general description of the things to be seized may

---

[7] The trial court ultimately excluded at trial all evidence from the expanded physical extraction after the State failed to call a witness from Cellebrite to authenticate it.

be sufficient if probable cause is shown and "a more specific description is impossible" with the information known to law enforcement at the time. *Id.*

While the degree of particularity required depends on the nature of the materials sought and the facts of each case, we evaluate search warrants "in a common sense, practical manner, rather than in a hypertechnical sense." *Id.* at 549 (citing *United States v. Turner,* 770 F.2d 1508, 1510 (9th Cir.1985)). We review de novo whether a search warrant contains a sufficiently particularized description of the items to be searched and seized. *Id*. at 549.

Alexander contends the October 22, 2019 warrant was overbroad because it authorized a general search of data with no subject matter limitation to connect the police search to evidence of the charged crime. We disagree. We recognize that the search of an electronic storage device, such as a cell phone, gives rise to heightened particularity concerns. *State v. Keodara*, 191 Wn. App. 305, 314, 364 P.3d 777 (2015). But we look to three factors set out in *State v. Higgins*, 136 Wn. App. 87, 147 P.3d 649 (2006) to determine if a warrant for such a search suffers from overbreadth: (1) whether probable cause exists to seize all items of a particular type described in the warrant; (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not; and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued. *Id.* at 91-92.

In this case, the warrant authorized the search of contact list information, ownership and usage information, photographs of Alexander, GPS data, voice call

and text messaging information, social media application information for messaging services, and internet search information related to the S.B.'s murder between October 11 and October 17, 2019. The police had probable cause to search each of these categories of information. The police could see Alexander using his cell phone as he left the apartment complex parking lot that night. As police noted in the warrant affidavit, information regarding with whom Alexander was communicating—either by voice call, text message, or social media messaging application—and Alexander's contact list could yield material witness information.

Similarly, the police had probable cause to search his cell phone for GPS data and photographs of Alexander. As the State convincingly argues, the police needed to identify Alexander as the individual seen with S.B. in the surveillance video on the night of her death. Photographs close in time to the crime or photographs of him in clothing consistent with the clothing visible in the video footage would be relevant to establishing his identity. And GPS data could similarly show that Alexander was present at the crime scene.

Furthermore, the police had probable cause to search and seize ownership and usage information which would demonstrate that the phone being searched was, in fact, Alexander's cell phone and that any evidence discovered on that phone was connected to Alexander.

Next, the warrant contained objective standards by which the police could differentiate between evidence they could seize and evidence they could not — evidence of S.B.'s murder within the aforementioned categories that fall within the

date range of October 11 to October 17, 2019. Where possible, the warrant further limited those categories. For example, police were authorized to seize photographs *of Alexander* and internet search information *related to S.B.'s murder*.

Finally, there is no indication from the record that the police could have described the evidence they sought with any more particularity at the time of the October 22, 2019 warrant application. Under the *Higgins* factors, this warrant was sufficiently particular and not overbroad.

Alexander relies on *State v. McKee*, 3 Wn. App. 2d 11, 413 P.3d 1049 (2018), *rev'd on other grounds*, 193 Wn.2d 271, 438 P.3d 528 (2019) and *State v. Fairley*, 12 Wn. App. 2d 315, 457 P.3d 1150 (2020) to support his overbreadth argument. Neither case is analogous.

In *McKee*, police obtained a search warrant authorizing a "physical dump" of "all of the memory of the phone for examination." *Id.* at 29. The warrant then described items to be seized from the cell phone, which included essentially any "electronic data from the cell phone showing evidence" of the crimes being investigated. *Id.* at 18-19. This court held that the warrant lacked the requisite particularity because it "was not carefully tailored to the justification to search and was not limited to data for which there was probable cause." *Id.* at 29. In other words, "the search warrant clearly allow[ed] search and seizure of data without regard to whether the data [was] connected to the crime." *Id.* "The warrant gives the police the right to search the contents of the cell phone and seize private information with no temporal or other limitation." This court noted that the search warrant's language left to the discretion of the police what to seize. *Id.*

In *Fairley*, police obtained a search warrant to seize Steven Brown's phone in relation to their investigation of a telephone bomb threat. *Id.* at 317. While the warrant authorized the seizure of the phone, it did not authorize a search of the data on it. *Id.* Despite this, police searched the phone and discovered evidence that Fairley communicated with Brown's daughter for purposes of prostitution and Fairley was charged with a number of misdemeanor offenses. *Id.* at 318. Fairley argued that the police lacked a valid search warrant to search Brown's phone but his attempts to suppress the text messages were unsuccessful. *Id.* Division Three reversed the trial court, concluding that the warrant did not authorize a search of the contents of Brown's phone. *Id.* at 321. The court noted that the "Fourth Amendment demands a cell phone warrant specify the types of data to be seized with sufficient detail to distinguish material for which there is probable cause from information that should remain private." *Id.* at 322.

Both cases are distinguishable. Unlike *McKee*, where the warrant allowed for the seizure of *any data,* here the evidence was limited both by time—it must have been generated between October 11 and October 17, 2019—and by type of data—such as contact information, photographs, or text messaging information—if that data was evidence of S.B.'s murder. And in *Fairley*, the court concluded that police never obtained permission to search the phone at all. By contrast, the police here got explicit authorization to search and that search was appropriately limited. We therefore conclude the October 22, 2019 warrant was not overbroad.

2. Scope of Warrant

Alexander next argues that the police exceeded the scope of the warrant by searching all of the photographs on his cell phone in disregard of the date range limitation in the warrant. We agree the police exceeded the scope of the October 22, 2019 warrant because the warrant did not provide authority to the police to conduct such a wholesale search of all photographs on the phone.

Both the state and federal constitutions require that the police "'execute a search warrant strictly within the bounds set by the warrant.'" *State v. Martine*s, 184 Wn.2d 83, 94, 355 P.3d 1111 (2015) (quoting *State v. Kelley*, 52 Wn. App. 581, 585, 762 P.2d 20 (1988)). The scope of a search warrant is determined by a commonsense reading of the warrant. *State v. Lyons*, 174 Wn.2d 354, 360, 275 P.3d 314 (2012).

Here, a commonsense reading of the warrant leads us to conclude that the police asked for and obtained judicial permission to search for and seize only photographs within a defined date range. It did not expressly authorize a wholesale search of all photographs on the phone.

When Detective Quick began his review of the photographs, he looked at each photograph for the described content, i.e., photographs depicting Alexander, without employing a date filter. At the CrR 3.6 hearing, Detective Quick explained the type of search he conducted, the manner in which he was able (or not) to filter photographs by date, and the reason he believed the available date filter was unreliable. But none of this information was provided to the issuing magistrate with a request to permit a wholesale seizure of photographs to winnow down the data

set to those that might fall within the specified date range. Detective Quick's explanation sounds reasonable and his method of searching the phone for responsive photographs would have likely been authorized. The problem here is that the explanation came after-the-fact and was not included in the search warrant application itself.

The United States Supreme Court, in holding that cell phones may not be searched incident to an arrest without a warrant, recognized that "[c]ell phones differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person." *Riley v. California*, 573 U.S. 373, 393, 134 S. Ct. 2473, 189 L. Ed. 2d 430 (2014). These devices are minicomputers that "happen to have the capacity to be used as a telephone. They could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers." *Id.* Cell phones have immense storage capacity. *Id.*

> The storage capacity of cell phones has several interrelated consequences for privacy. First, a cell phone collects in one place many distinct types of information—an address, a note, a prescription, a bank statement, a video—that reveal much more in combination than any isolated record. Second, a cell phone's capacity allows even just one type of information to convey far more than previously possible. The sum of an individual's private life can be reconstructed through a thousand photographs labeled with dates, locations, and descriptions; the same cannot be said of a photograph or two of loved ones tucked into a wallet. Third, the data on a phone can date back to the purchase of the phone, or even earlier. A person might carry in his pocket a slip of paper reminding him to call Mr. Jones; he would not carry a record of all his communications with Mr. Jones for the past several months, as would routinely be kept on a phone.

*Id.* at 394-95; *see also State v. Samalia*, 186 Wn.2d 262, 270, 375 P.3d 1082 (2016) (search of a cell phone has potential to reveal vast amount of personal information).

We conclude that a warrant to search a cell phone is analogous to a warrant to search a person's computer. As the Ninth Circuit held in *United States v. Hill*, 459 F.3d 966, 975 (9th Cir. 2006), "the government [does not have] an automatic blank check when seeking or executing warrants in computer-related searches. Although computer technology may in theory justify blanket seizures . . . , the government must still demonstrate to the magistrate *factually* why such a broad search and seizure authority is reasonable in the case at hand."

Here, the police could have explained to the issuing magistrate why they needed to conduct a broad search of all photographs stored on Alexander's device to find those that would fit within the specified date range. They did not do so. The warrant itself permitted seizure only of photographs falling within a specified date range. The police exceeded the permissible scope of the search by looking at all photographs on the cell phone.

The State argues that the police had the right to seize the photograph of Alexander in the Oakland Raiders hat under the plain view doctrine. We disagree. The plain view doctrine applies when police (1) have a valid justification to be in an otherwise protected area; and (2) are immediately able to realize the evidence they see is associated with criminal activity. *State v. Morgan*, 193 Wn.2d 365, 370, 440 P.3d 136 (2019). If they are justified by a warrant to search for a specific item and happen across an item for which they had not been searching, then they may

seize that item. *Id.* But the plain view doctrine requires the State to be lawfully searching a particular area. Here, the State did not have the authority to search photographs falling outside the specified date range.

For this reason, we conclude the police exceeded the scope of the warrant when they searched through photographs that fell outside the time range dictated by the October 22 warrant. As a result, the portion of the November 12 warrant that relies on this illegally discovered evidence is tainted and any evidence seized under that authority must be suppressed. "Evidence is inadmissible as 'fruit of the poisonous tree' where it has been gathered by exploitation of the original illegality." *State v. Aydelotte,* 35 Wn. App. 125, 131, 665 P.2d 443 (1983). Thus, the photographs of Alexander wearing the Oakland Raider's hat must be suppressed as fruit of the unlawful search.

But we also conclude the tainted portion of the November 12 warrant is severable from the remainder of that warrant. If a meaningful separation can be made between the valid and invalid portions of a warrant, evidence seized pursuant to the valid portions of the warrant will not be suppressed. *Perrone*, 119 Wn.2d at 560; *State v. Moses,* 22 Wn. App. 2d 550, 562, 512 P.3d 600 (2022). A search warrant is severable if there is a "logical and reasonable basis for the division of the warrant into parts." *Perrone,* 119 Wn.2d at 560. The only section of the November 12 warrant that relied on and was rendered invalid by the police's erroneous execution of the warrant is that section which authorized the seizure of photographs, videos, and associated metadata depicting Alexander and knit hats. We now sever this portion.

The remaining sections of the November 12 warrant, which authorized the seizure of "[d]ata extracted from a 'physical dump' of the devices media storage file related directly to the functional operations systems, specifically the flashlight function and the power on and off function" and "[d]eleted or encrypted data associated with text messages, internet browser searches and results, contacts and calls to and from the device" remain valid and evidence seized under those sections is admissible at trial.

3.  Timeliness of Cellebrite Physical Extraction

Alexander also challenges the physical extraction conducted pursuant to the November 12, 2019 search warrant addendum, and the trial court's refusal to suppress evidence obtained from that extraction process, arguing that the police failed to complete the extraction within the ten-day time limit of that warrant.[8] We reject this argument.

The November 12, 2019 search warrant addendum commanded the police to search Alexander's phone within ten days of the issuance of the warrant and to seize "[d]eleted or encrypted data associated with text messages, contacts and calls to and from the device for the date range of October 11th, 2019 0001 Hrs. PST to October 17th, 2019 1600 Hrs."  On November 13, 2019, Detective Quick determined that he was unable to carry out the physical extraction himself and sent the phone to the Secret Service, who subsequently sent it to Cellebrite, who

---

[8] The State contends this assignment of error is moot because the trial court did not admit any evidence derived from this expanded search.  The record does not support this contention.  The State used information from the Cellebrite physical extraction to establish probable cause to obtain a search warrant for records from Google, Inc.  Google produced "tombstone files," evidence of deleted location data, which the State offered and the trial court admitted at trial.  Thus, the evidence from Google was the fruit of the search by Cellebrite.

performed the physical extraction. Detective Quick received the physical extraction report on January 10, 2020, well after the 10-day period. The trial court acknowledged that the search took longer than 10 days but concluded that this was not a basis for suppression. We agree.

"A search is constitutionally timely so long as it begins before the expiration of a warrant and as long as probable cause continues through completion of the search." *State v. Grenning*, 142 Wn. App. 518, 532, 174 P.3d 706 (2008), *aff'd*, 169 Wn.2d 47, 234 P.3d 169 (2010). This case is analogous to *State v. Kern*, 81 Wn. App. 308, 914 P.2d 114 (1996). There, in a theft investigation, police obtained a search warrant for Kern's bank records that commanded that the search occur within 10 days. *Id.* at 310. Police served that warrant on the day it issued but did not receive records from the responding bank until 17 days later. *Id.* at 311. Kern contended, as Alexander does here, that the delay was a violation of the warrant and of CrRLJ 2.3(c) requiring a reversal of his conviction. *Id.* at 311-12.

This court rejected Kern's argument on appeal, concluding that a search is constitutionally timely so long as the search begins before the warrant expires and so long as probable cause continues throughout the completion of the search. *Id.* at 312. We reasoned that the search began when the police served the warrant because service "initiated the bank's records retrieval process." *Id.* Because the search began before the warrant expired, the search was timely.

This case is analogous. Detective Quick initiated the request for assistance in extracting the cell phone data the day after the warrant issued. This request, made before the warrant expired, began the search process within the time

allowed to conduct the search. And Alexander makes no argument that probable cause did not continue through January 2020, when Cellebrite performed the actual extraction. We conclude this search was timely.

C. Suicidal Behavior and Consciousness of Guilt

Finally, Alexander challenges the admissibility of jail video showing him repeatedly stabbing himself in the neck with a pen.

The State admitted evidence that on the day of Alexander's arrest, while standing in the booking area of the jail, security cameras captured him standing at the booking counter, speaking with someone and filling out paperwork. As Alexander walked away from the counter, he spontaneously began jabbing himself in the neck with a pen. While he was able to stab himself repeatedly before officers subdued him, he did not do any serious harm to himself and no blood or injury can be seen on the video.

The State argued the video showed a "suicide attempt" that was relevant to Alexander's consciousness of guilt. The court agreed that Alexander's actions were consistent with an effort to avoid prosecution and admitted the evidence for that limited purpose. In closing argument, however, the State cited to this evidence—not as a demonstration of Alexander's remorse or feelings of guilt—but to argue that Alexander could be calm and cooperative one moment and suddenly violent the next.

Alexander challenges the admissibility of the video and the State's misuse of that evidence in closing. We agree the trial court abused its discretion in admitting the video to show Alexander's consciousness of guilt.

No Washington court has addressed whether suicidal conduct is properly admitted as evidence of a defendant's consciousness of guilt.[9]  As the trial court noted, evidence of a defendant's flight has long been considered admissible evidence of guilt.  *State v. Bruton*, 66 Wn.2d 111, 112, 401 P.2d 340 (1965).  The State contends that evidence of a defendant's suicide attempt is analogous to evidence of flight.

But in *Bruton*, the Supreme Court held that "the circumstances or inference of flight must be substantial and real.  It may not be speculative, conjectural, or fanciful."

> In other words, the evidence or circumstances introduced and giving rise to the contention of flight must be substantial and sufficient to create a reasonable and substantive inference that the defendant's departure from the scene of difficulty was an instinctive or impulsive reaction to a consciousness of guilt or was a deliberate effort to evade arrest and prosecution.  Pyramiding vague inference upon vague inference will not supplant the absence of basic facts or circumstances from which the essential inference of an actual flight must be drawn.

*Id.* at 112-113.

Our Supreme Court recently reexamined *Bruton* in *State v. Slater*, 197 Wn.2d 660, 486 P.3d 873 (2021), a case in which the trial court admitted evidence that the defendant failed to appear at a pretrial hearing as evidence of an attempt to flee prosecution.  The Supreme Court concluded that a single failure to appear, unaccompanied by additional evidence of avoiding prosecution, was "the most

---

[9] Many courts have held that evidence of an attempted suicide, like evidence of flight, is relevant to a defendant's consciousness of guilt.  *State v. Martin*, 146 Hawai'i 365, 382, 463 P.3d 1022 (2020); *see also Aldridge v. State*, 229 Ga. App. 544, 545, 494 S.E.2d 368 (1997) ("When faced with the question, the courts of other states in almost every instance have allowed evidence of attempted suicide to go to the jury for whatever weight it chooses to place upon it."); Dale Joseph Gilsinger, Annotation, Admissibility of Evidence Relating to Accused's Attempt to Commit Suicide, 73 A.L.R. 5th 615 (1999).

tenuous and speculative form of alleged flight evidence." *Id.* at 670-71, 673. It held that "[a] trial court must not automatically allow this type of evidence but must first decide whether or not the proposed evidence amounts to a reasonable inference of flight that is more than mere speculation and supports a consciousness of guilt inference." *Id.* at 674.

We see no reason to apply a different test to evidence of an alleged suicide attempt when the State offers that evidence as proof of consciousness of guilt. As in *Slater,* where the threshold question was whether a failure to appear amounted to "flight," the threshold question here is whether Alexander's actions were, in fact, suicidal conduct. The video, by itself, does not support such a finding. Aside from engaging in self-harm with an ink pen—behavior hardly likely to result in death— the State presented no other evidence to suggest Alexander was actually attempting to kill himself to avoid prosecution. And while we can speculate as to why Alexander stabbed himself in the neck, such speculation is insufficient under *Slater* to support a consciousness of guilt inference. We therefore conclude the trial court abused its discretion in admitting the jail video as evidence from which the jury could infer consciousness of guilt.[10]

---

[10] We also agree with Alexander that the State used the evidence to suggest, impermissibly, that Alexander was predisposed to violence. The prosecutor argued:

> But probably the best evidence that you have, in addition to all of this, is what the defendant tells you with his actions once he's arrested.

> Stabbing himself multiple times in the throat with a pen, which, I would suggest, can only be characterized as a suicide attempt. *What is kind of chilling about that particular video is just how quickly the defendant goes from cool, calm, and cooperative to stabbing himself in the throat.*

(Emphasis added.) The State's closing argument was peppered with references to Alexander as "a dangerous man" who "stomped" S.B. to death and "left her in the dirt naked." The video of Alexander attempting to stab himself with a pen is not admissible to support any such argument.

CONCLUSION

We conclude the trial court erred in excluding evidence that Catherine Roy admitted to participating in the murder of S.B., an evidentiary error that is not harmless. We also conclude the trial court abused its discretion in excluding the date and time entry on S.B.'s October 11 diary entry for the limited nonhearsay purpose of impeaching the police investigation.

We further conclude the police exceeded the scope of the October 22, 2019 search warrant by examining all photographs on Alexander's cell phone without demonstrating to the issuing magistrate that such a general search was necessary to find photographs inside the date range specified in the warrant. Finally, we conclude the trial court abused its discretion in admitting a jail video of Alexander engaging in self-harming behavior as evidence of his consciousness of guilt.

We reverse Alexander's conviction and remand this matter for a new trial.

Andrus, J.P.T.

WE CONCUR:

Birk, J.

Smith, C.J.